**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

Park Place Corporation,

                 Plaintiff,

      vs.

Carpenter Company; E.R. Carpenter, L.P.
(f/k/a Carpenter Chemical, L.P.);
Carpenter Holdings, Inc.; Crest Foam
Industries Inc.; Domfoam International,
Inc.; Flexible Foam Products, Inc.; FXI
Foamex Innovations, Inc.; Future Foam,
Inc.; Inoac Corporation; Inoac USA Inc.;
Leggett & Platt Inc.; Mohawk Industries,
Inc.; Ohio Decorative Products, Inc.; Otto
Bock Polyurethane Technologies, Inc.;
Plastomer Corporation; Scottdel Inc.; Louis
Carson; David Carson; Valle Foam
Industries, Inc. (1995); Vitafoam Inc.;
Vitafoam Products Canada Limited; British
Vita Unlimited; Woodbridge Sales &
Engineering, Inc.; Woodbridge Foam
Fabricating, Inc.; and Woodbridge Foam
Corporation,

                 Defendants.

Case No.   6:13-cv-2085-JMC

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Park Place Corporation sues Defendants Carpenter Company; E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.); Carpenter Holdings, Inc.; Crest Foam Industries, Inc.; Domfoam International, Inc.; Flexible Foam Products, Inc.; FXI-Foamex Innovations, Inc.; Future Foam, Inc.; Inoac Corporation; Inoac USA, Inc.; Leggett & Platt Inc.; Mohawk Industries, Inc.; Ohio Decorative Products, Inc.; Otto Bock Polyurethane Technologies, Inc.; Plastomer Corporation; Scottdel Inc.; Louis Carson; David Carson;

Vallefoam Industries, Inc. (1995); Vitafoam Inc.; Vitafoam Products Canada Limited; British Vita Unlimited; Woodbridge Sales & Engineering, Inc.; Woodbridge Foam Fabricating, Inc.; and Woodbridge Foam Corporation (collectively "Defendants") and alleges as follows:

1.      This case arises out of a conspiracy among Defendants and their co-conspirators to fix the prices of and not to compete on the sale of flexible polyurethane foam sold to Plaintiff and others in the U.S. between approximately January 1999 and July 2010 in *per se* violation of Section One of the Sherman Act, 15 U.S.C. § 1.

2.      Flexible polyurethane foam is a major input in the production of the bedding and mattress products produced by Plaintiff.  Plaintiff directly purchased substantial quantities of flexible polyurethane foam from Defendants and/or their co-conspirators during this conspiracy.  The Defendants conspired to and did fix the prices for polyurethane foam at collusive and non-competitive levels.  As a proximate result of the conspiracy, Plaintiff was injured in its business and property because the prices it paid for polyurethane foam were higher than they would have been absent the conspiracy.  By this action, Plaintiff seeks to recover the overcharge damages which it sustained as a result of the unlawful conduct of Defendants and their co-conspirators and to enjoin such conduct in the future.

3.      In February 2010, Defendant Vitafoam, Inc. voluntarily approached the United States Department of Justice (the "DOJ"), Antitrust Division, to self-report evidence of illegal antitrust activities amongst itself and other companies and individuals in the industry ("competitors") and to seek acceptance into the Antitrust

Division's Corporate Leniency Program.  Since that time, Vitafoam and its employees have been cooperating with a criminal investigation into illegal anticompetitive conduct in the flexible polyurethane foam market being conducted by antitrust authorities in the United States, Canada, and the European Union.

4.      Substantial evidence of the conspiracy has been gathered by the DOJ during its investigation of this conspiracy.  This evidence, a portion of which was contained in an affidavit filed by the Federal Bureau of Investigation to obtain a search warrant on Hickory Springs Manufacturing Company ("Hickory Springs") that was, for a time, unsealed, includes direct evidence of specific and detailed communications by executives and employees of Defendants regarding their agreement to fix prices.  It also includes direct evidence of an agreement among some Defendants not to solicit each other's customers in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

5.      Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commission of Competition in Canada strongly supports Plaintiff's allegations.

6.      In their September 2011 answers to complaints filed in MDL 2196 and in subsequent pleadings, the Vitafoam Defendants admitted the existence of this price-fixing conspiracy and their active participation in it.  For example, (a) Vitafoam stated that it "communicated with other Defendants to coordinate on price increases and allocate customers for flexible polyurethane foam in the United States" and (b) Vitafoam admitted that it "communicated regarding price increases with other Defendants at trade association meetings and through telephone conversations and written exchanges (including price increase announcements) via facsimile and email."

7.      In January 2012, Defendants Valle Foam and Domfoam were indicted and pled guilty to violating Canadian competition laws by fixing prices of flexible polyurethane foam with Defendants herein.

8.      Evidence of the conspiracy herein has also come to light through litigation of a conspiracy involving upstream urethane chemical and polyether polyols suppliers, In re Urethane Chemicals Antitrust Litig., MDL 1616 ("Urethanes"), in which a number of the Defendants in the instant action are plaintiffs.

9.      The allegations in this Complaint are pled in the alternative if necessary to avoid inconsistency.

## I.      JURISDICTION AND VENUE

10.      This civil antitrust action arises under Section 1 of the Sherman Act, 15 U.S.C. § 1, for treble damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15(a), and for permanent injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26.

11.      Subject matter jurisdiction is conferred upon this Court by Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and by 28 U.S.C. §§ 1331 and 1337.

12.      Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act, 15 U.SC. §§ 15 and 22, and 28 U.S.C. § 1391, for any one or more of the reasons stated in the subparagraphs below.  Each of the subparagraphs below should be read in the alternative, if necessary, to avoid inconsistency.

(a)      Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because a substantial part of the events giving rise to these claims occurred in this District, including the sale at artificially high prices of polyurethane foam.

(b)     Venue is proper in this District pursuant to 28 U.S.C. § 1391(c) because each Defendant is subject to personal jurisdiction in this District.

(c)     Defendants transact business or are found in this District, or as alleged in some paragraphs below, they transact business directly and/or through the activities of domestic subsidiaries or affiliates whom each foreign Defendant dominates and controls within this District and, therefore, venue is proper under 15 U.S.C. § 22.

(d)     Defendants Vitafoam Products Canada Limited, British Vita Unlimited, and Woodbridge Foam Corporation are legal aliens and may be sued in any District pursuant to 28 U.S.C. § 1391(d).

(e)     To the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

13.     Defendants are subject to the personal jurisdiction of this Court for any one or more of the reasons stated in the subparagraphs below.  Each of the subparagraphs should be read in the alternative, if necessary, to avoid inconsistency.

(a)     Defendants are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found or has sufficient minimum contacts in the United States sufficient to satisfy due process.

(b)     Defendants are amenable to service of process because each inhabits, transacts business in, has continuous or systematic contacts with, or is found in this District.  Defendants headquartered outside this District are nevertheless engaged in the business of developing, manufacturing, distributing, advertising and/or selling polyurethane foam throughout the United States, including in this District.

(c)     Defendants are amenable to service of process because each Defendant belonged to the conspiracy alleged in this Complaint and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District including, without limitation, selling polyurethane foam to Plaintiff and/or others in this District at artificially inflated prices.

(d)     Defendants are amenable to service of process pursuant to Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure and the long-arm statute of the State in which this Federal Court sits because each Defendant has transacted business in the State and because the State's long-arm statute extends jurisdiction to the limits of due process and each Defendant has sufficient minimum contacts with the State to satisfy due process.

(e)     This Court has personal jurisdiction over Defendants because they and one or more of their co-conspirators contracted to supply services or goods, including polyurethane foam, or have agents who contracted to supply materials or goods, including polyurethane foam, in the State where this Federal Court sits (the "State"); money flowed from Plaintiff or other purchasers in the State to pay Defendants and their co-conspirators for polyurethane foam; Defendants and one or more of their co-conspirators transact business in the State or have agents who transact business on their behalf in the State in furtherance of the conspiracy; Defendants and their co-conspirators did or caused one or more unlawful acts to be done, or consequences to occur, in the State; and Defendants and their co-conspirators engaged in unlawful conduct described below outside of the State causing injury to Plaintiff in the State.

14.    To the extent that any Defendant or co-conspirator engaged in conduct in Canada or Europe in connection with, or as part or in furtherance of, the unlawful conduct alleged in this Complaint, it did so with the intention that such conduct would have, and did have, a substantial and reasonably foreseeable direct, proximate, and adverse effect on, and was inextricably linked with, the price of polyurethane foam sold to Plaintiff and others in the United States, and that domestic effect – individually or in concert with other domestic effects alleged in this Complaint gives rise to Plaintiff's claims alleged in this Complaint.

## II.    PARTIES

### A.    Plaintiff

15.    Plaintiff Park Place Corporation (hereinafter "Park Place") is a South Carolina corporation with its principal place of business at 6801 Augusta Road, Greenville, South Carolina 29605.  Park Place manufactures mattresses and bedding products.  During the conspiracy period, Park Place purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators.

16.    During the relevant period, Park Place owned Comfortaire Corporation ("Comfortaire"), which purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators.  Park Place sold Comfortaire in 2013, but retained the claims arising from Comfortaire's purchases of polyurethane foam and which are asserted herein.  Further, in 2007, Park Place Corporation bought the assets, including the claims asserted herein, of United Sleep Products, Inc., with its principal place of business at 412 Oak Street, Denver, PA 17517, and that of United Sleep Products Inc.'s affiliates/subsidiaries: United Sleep Products Denver Inc.; United Sleep

Products Leola Inc.; and United Sleep Products Fort Wayne Inc. (collectively "United Sleep Products"). United Sleep Products purchased polyurethane foam in the United States from one or more Defendants and/or their co-conspirators during the relevant period. Park Place, Comfortaire, and United Sleep Products are hereafter collectively referred to as "Park Place" or "Plaintiff."

17. The prices for polyurethane foam paid by Park Place to Defendants and their co-conspirators were fixed, stabilized, and/or increased as a direct result of the conspiracy between Defendants and their co-conspirators. Consequently, Park Place suffered significant injury to its business and property by reason of the Defendants' and their co-conspirators' antitrust violations at issue herein.

18. During time periods relevant to the allegations in this Complaint, Plaintiff directly purchased polyurethane foam in the United States from one or more of the Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the antitrust violations alleged in this Complaint.

19. Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1. During time periods relevant to the allegations in this Complaint, Plaintiff directly purchased in the United States polyurethane foam from one or more Defendants and/or their co-conspirators.

20. Plaintiff timely opted out and excluded itself from all class settlements which were the subject of notice sent to class members prior to the filing of this Complaint.

B.     **Defendants**

**Carpenter Entities**

21.     Defendant Carpenter Company ("Carpenter USA") is a privately owned company with its principal place of business at 5016 Monument Avenue, Richmond Virginia 23230.  Carpenter USA is the parent of domestic Carpenter entities, including Carpenter ER (defined below) and Carpenter Holdings (defined below).  Carpenter USA is also the parent or other affiliate of foreign Carpenter entities who manufacture and/or sell polyurethane foam, including Carpenter Canada Co. ("Carpenter Canada"), which is a Canadian corporation with its principal place of business in Woodbridge, Ontario, Canada; Carpenter-Duma NV (Belgium); Carpenter APS (Denmark); Carpenter S.A.S. (France); Carpenter GmbH (Germany); Carpenter Sweden AB (Sweden); and Carpenter LTD (United Kingdom).  Carpenter USA characterizes itself as the largest producer of comfort cushioning products, including flexible polyurethane foam, in the world.  During time periods relevant to the allegations in this Complaint, Carpenter USA directly and/or through Carpenter ER and/or Carpenter Holdings manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

22.     Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("Carpenter ER") is a Virginia limited partnership with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  During time periods relevant to the allegations in this Complaint, Carpenter ER directly and/or on behalf of or through Carpenter USA or Carpenter Holdings manufactured and/or directly sold polyurethane

foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

23.    Defendant Carpenter Holdings, Inc. ("Carpenter Holdings") is a Virginia corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.    During time periods relevant to the allegations in this Complaint, Carpenter Holdings directly and/or on behalf of or through Carpenter USA or Carpenter ER manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

24.    Carpenter USA, Carpenter ER, Carpenter Holdings and/or Carpenter Canada were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

25.    Carpenter USA, Carpenter ER and Carpenter Holdings are individually and collectively referred to in this complaint as "Carpenter" or the "Carpenter Defendants."

26.    Carpenter is the world's largest producer of flexible foam products for comfort cushioning. During time periods relevant to these allegations, Carpenter manufactured and/or sold a substantial amount of polyurethane foam for bedding, furniture, carpet, automotive and other applications at artificially high prices.  Carpenter benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

**Crest**

27.     Defendant Crest Foam Industries Inc. ("Crest") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074. Crest, a wholly owned subsidiary of Inoac USA, was formerly a joint venture between Vitafoam and Inoac Corp. in which Vitafoam had majority control.   In 2010, Inoac took 100% control of Crest.    During the time period for which Vitafoam had majority control of Crest, executives of Vitafoam acted as agents for Crest in the conspiracy alleged in this Complaint.     Crest manufactures and/or distributes polyurethane foam for automotive, cushioning, and medical applications.    During the Conspiracy Period, Crest and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

28.     During the Conspiracy Period, Crest sold polyurethane foam at artificially high prices.    Crest benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

**Domfoam**

29.     Defendant Domfoam International, Inc. ("Domfoam") is the parent of Valle Foam Industries, with its headquarters located at 8785 Langelier Blvd., Montreal, Quebec, H1P 2C9 Canada.  During the relevant period, Domfoam directly sold flexible polyurethane foam throughout the United States.

30.     Domfoam is a manufacturer/wholesaler of sponge and polyurethane foam. Since its incorporation in 1963, Domfoam has grown to be Canada's leading and most diversified manufacturer of ether, ester, rebounded flexible polyurethane foams and visco-elastic foam.   According it to its website, "[i]n its 260,000 square-foot Montreal

plant, Domfoam services the demanding urethane market in Canada and in the USA by meeting the toughest industry standards and requirements." Domfoam provides foam for the following purposes: mattresses, sponge foam blocks, carpet cushion, pillows, bolsters, convolute, furniture foam, toppers, antistatic foam, anti-microbial foam, visco-elastic foam, camping foam, and sporting goods.

**Flexible Foam**

31.    Defendant Flexible Foam Products, Inc. ("Flexible Foam") is a privately owned company with its principal place of business at 12575 Bailey Road, Spencerville, Ohio 45887 and operations in Texas, Indiana, Florida, and Wisconsin.  Flexible Foam is a subsidiary or division of Ohio Decorative Products, Inc., also of Spencerville, Ohio.

32.    Flexible Foam Products is a national leader in the foam industry, and manufactures polyurethane foam and rebond products for customers in the bedding, flooring, furniture, packaging, and transportation industries.  During the Conspiracy Period, Flexible Foam Products directly manufactured and/or sold polyurethane foam throughout the United States.

33.    During time periods relevant to the allegations in this Complaint, Flexible Foam directly and/or on behalf of or through Ohio Decorative Products manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Foamex USA**

34.    Defendant FXI-Foamex Innovations, Inc. ("Foamex USA"), formerly known as Foamex International, Inc., is a private company with its principal place of business

at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.  Upon information and belief, Foamex USA acquired the assets and liabilities of Foamex International, Inc., Foamex L.P., BFF Foam Corp., and 2422735 Canada Inc. (f/k/a Foamex Canada Inc.) ("Foamex Canada"), including liabilities arising from or related to the antitrust violations alleged in this Complaint. During time periods relevant to these allegations, including, but not limited to, after June 2009 and/or after Foamex USA acquired the assets of the companies identified in the immediately preceding sentence, Foamex USA manufactured and/or directly sold polyurethane foam to Plaintiff and others in the United States; Foamex USA continued in the conspiracy alleged in this Complaint or joined in the conspiracy after it was underway with knowledge of what had gone on before and with an intent to pursue the same objectives as its co-conspirators of not competing on the sale of polyurethane foam sold to Plaintiff and others in the United States and elsewhere; and otherwise engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Furthermore, during time periods relevant to the allegations in this Complaint, Foamex USA directly and/or through Foamex International, Inc., Foamex L.P., BFF Foam Corp. or Foamex Canada manufactured and/or directly sold polyurethane foam to Plaintiff and/or to others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

35.     Before Foamex USA acquired Foamex International, Inc. and Foamex L.P., and during time periods relevant to these allegations, Foamex L.P. itself and/or on behalf of Foamex International, Inc. manufactured and/or directly sold polyurethane

foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

36.    Before Foamex USA acquired BFF Foam Corp. and Foamex Canada, and during time periods relevant to these allegations, BFF Foam Corp. and Foamex Canada manufactured and/or directly sold polyurethane foam; BFF Foam Corp. and/or Foamex Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing, or sale in the United States and/or elsewhere; and BFF Foam Corp. and Foamex Canada engaged in the unlawful conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

37.    Before Foamex USA acquired Foamex International, Inc. Foamex L.P., BFF Foam Corp. and Foamex Canada, each of those entities were members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees, and representatives.

38.    Alternatively, before Foamex USA acquired them, BFF Foam Corp. and Foamex Canada were each a member of the conspiracy alleged in this Complaint because of, among other reasons, and upon information and belief, their respective status during time periods relevant to these allegations as the alter ego or agent of Foamex International, Inc. and/or Foamex L.P. as evidenced by, among other things, Foamex International, Inc.'s and/or Foamex L.P's domination or control over BFF Foam Corp. and/or Foamex Canada with respect to one or more of the following: (i) the prices

at which BFF Foam Corp. and/or Foamex Canada sold polyurethane; (ii) the hiring and firing of officers or members of the Board of Directors of BFF Foam Corp. and/or Foamex Canada; (iii) the budgets for BFF Foam Corp. and/or Foamex Canada; (iv) the capitalization of and/or loans to BFF Foam Corp. and/or Foamex Canada; (v) the transfer of officers or employees between BFF Foam Corp. and/or Foamex Canada and Foamex International, Inc. and/or Foamex L.P.; (vi) financial benefits provided to officers or employees of BFF Foam Corp. and/or Foamex Canada; (vii) the business plan or operation of BFF Foam Corp. and/or Foamex Canada; (viii) officers or employees of Foamex International, Inc. and/or Foamex L.P. communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of BFF Foam Corp. and/or Foamex Canada; (ix) Foamex International, Inc. and/or Foamex L.P. used BFF Foam Corp. and/or Foamex Canada as its/their instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Foamex International, Inc. and/or Foamex L.P. used to charge Plaintiff and others supracompetitive prices for polyurethane foam; and/or Foamex International, Inc. or Foamex L.P. and BFF Foam Corp. or Foamex Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias or other marks.  Foamex International, Inc. and/or Foamex L.P. dominated or controlled BFF Foam Corp and/or Foamex Canada with respect to conspiracy activities alleged in this Complaint.

39.    Foamex International, Inc., Foamex L.P., Foamex Canada and BFF Foam Corp. are individually and collectively referred to as "Foamex" or the "Foamex Defendants."

40.    During time periods relevant to these allegations, Foamex manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications.

## Future Foam

41.    Defendant Future Foam, Inc. ("Future Foam") is a private company with its principal place of business at 1610 Avenue N, Council Bluffs, Iowa 51501.  During time periods relevant to these allegations, Future Foam manufactured and/or sold polyurethane foam for bedding, furniture, carpet and other applications.  During time periods relevant to the allegations in this Complaint, Future Foam manufactured and/or directly sold polyurethane foam at artificially high prices to Plaintiff and/or others in the United States, and engaged in the conduct described in this Complaint in per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Future Foam benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

## Inoac Entities

42.    Defendant Inoac Corporation ("Inoac Corp.") is a Japanese company with its principal place of business located at 2-13-4 Meieki Minami, Nakamura-ku, Nagoya 450-0003, Japan.   Inoac Corp. makes polyurethane foam for, *inter alia*, furniture, bedding, and cushions.  During the Conspiracy Period, Inoac Corp. and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

43.     Defendant Inoac USA Inc. ("Inoac USA" collectively with Inoac Corp., "Inoac") is a private corporation with its principal place of business at 901 1/2 Nutter Drive, Bardstown, Kentucky 40004.   Inoac USA is the parent company of Defendant Crest Foam Industries Inc. Inoac USA is itself a subsidiary of Inoac Corp., and part of Inoac's overseas network engaged in foam products fabrication sales.   During the Conspiracy Period, Inoac USA and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

44.     Inoac Corp. participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority. Further, Inoac Corp. benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.   Inoac Corp. also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Inoac USA.   Inoac Corp. dominated or controlled Inoac USA regarding conspiracy activities and used that domination or control to charge artificially high prices for polyurethane foam.

**<u>Leggett & Platt</u>**

45.     Defendant Leggett & Platt Inc. ("Leggett") is a corporation organized and existing under the laws of the State of Missouri with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.   During time periods relevant to these allegations, Leggett manufactured and/or sold polyurethane foam for bedding, furniture, carpet, and other applications.   During time periods relevant to the allegations in this Complaint, Leggett manufactured and/or directly sold polyurethane foam to Plaintiff

and/or others in the United States, and engaged in the conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## Mohawk

46.     Defendant Mohawk Industries, Inc. ("Mohawk") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business located at 160 South Industrial Boulevard, Calhoun, Georgia 30701.   During time periods relevant to these allegations, Mohawk manufactured and/or sold polyurethane foam for carpet and other applications.   During time periods relevant to the allegations in this Complaint, Mohawk manufactured and/or directly sold polyurethane foam in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

## Ohio Decorative

47.     Ohio Decorative Products, Inc. ("Ohio Decorative"; collectively with Flexible Foam Products, "Flexible Foam") is a private corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887.   Ohio Decorative is the parent company of Flexible Foam Products. During the Conspiracy Period, Ohio Decorative and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

48.     Ohio Decorative participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority.   Further, Ohio Decorative benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.   Ohio Decorative also was a member of the conspiracy by virtue of its status during the Conspiracy

Period as the alter ego or agent of Flexible Foam Products as evidenced by, among other reasons and upon information and belief, Ohio Decorative' s domination or control over Flexible Foam Products with respect to one or more of the following activities: (i) the prices at which Flexible Foam Products sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of Flexible Foam Products; (iii) the budget for Flexible Foam Products; (iv) the capitalization of and/or loans to Flexible Foam Products; (v) the transfer of officers or employees between Ohio Decorative and Flexible Foam Products; (vi) financial benefits provided to officers or employees of Flexible Foam Products; (vii) the business plan or operation of Flexible Foam Products; (viii) officers or employees of Ohio Decorative communicated with, serviced, or called on purchasers of polyurethane foam despite the presence or with the knowledge of Flexible Foam Products; (ix) Ohio Decorative used Flexible Foam Products as its instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale, or production of polyurethane foam obtained through conspiracy communications which Ohio Decorative, in turn, used to make sure that Flexible Foam Products charged Plaintiff and/or others supracompetitive prices for polyurethane foam; and/or (x) Ohio Decorative and Flexible Foam Products have a unified marketing image, including common branding products and/or common corporate logos, insignias, or other marks.  Ohio Decorative dominated or controlled Flexible Foam Products regarding conspiracy activities and used that domination or control to charge artificially high prices for polyurethane foam.

**Otto Bock**

49.     Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock") is a private company with its principal place of business at 3 Penn Center West, Suite 406, Pittsburgh, Pennsylvania 15205.  Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a German company with its principal place of business at Max-Naeder-Street 15, 37715 Duderstadt, Germany and the corporate slogan "Best in Foam."  During the Class Period, Otto Bock and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

**Plastomer**

50.     Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business at 37819 Schoolcraft Road, Livonia, Michigan 48150. Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells flexible polyurethane foam primarily for the transportation industry.  During the Class Period, Plastomer and/or affiliates it controlled sold flexible polyurethane foam throughout the United States.

**Scottdel, Louis Carson, and David Carson**

51.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters at 400 Church Street, Swanton, Ohio 43558.  Scottdel was placed into receivership in the action <u>Fifth Third Bank v. Scottdel, Inc.</u>, No. 10-CV-000293 (Ct. Common Pleas, Fulton City, Ohio).  During the Conspiracy Period, Scottdel and/or affiliates it controlled directly sold polyurethane foam throughout the United States.

52.     Defendant Louis Carson is a United States citizen and a resident of Swanton, Ohio. Mr. Carson was the president of Scottdel whose responsibilities included, setting prices for Scottdel's products throughout the United States. During the Conspiracy Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell polyurethane foam throughout the United States.

53.     Defendant David Carson is a United States citizen and resident of Swanton, Ohio. Mr. Carson was the vice president of manufacturing at Scottdel whose responsibilities included setting prices for Scottdel's products throughout the United States. During the Conspiracy Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell polyurethane foam throughout the United States.

54.     Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

55.     During the Conspiracy Period, Scottdel sold a substantial amount of polyurethane foam at artificially high prices. Scottdel, Louis Carson, and David Carson benefited from the conspiracy by receiving extra profits they would not have received had the conspiracy not existed.

**Valle**

56.     Defendant Valle Foam Industries (1995), Inc. ("Valle") is a privately owned and operated corporation with its headquarters located at 4 West Drive, Brampton, Ontario, L6T 2H7, Canada.  Valle is a subsidiary of Domfoam and under common control.  Valle manufactures flexible polyurethane foam for furniture, bedding, packaging, carpet and children's toy industries.

57.    Valle participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority. Further, Valle benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.   Valle also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Domfoam.  Valle dominated or controlled Domfoam regarding conspiracy activities and used that domination or control to charge artificially high prices for polyurethane foam.

58.    On January 5, 2012, Domfoam and Valle pleaded guilty to conspiracy under the Canadian Competition Act and were fined a total of $12.2 million for participating in a price-fixing cartel for polyurethane foam.

59.    Domfoam and Valle admitted they had agreed with competitors to fix the price of polyurethane foam products manufactured at their plants during the Conspiracy Period.   This admitted conspiracy is part of the conspiracy that gives rise to Plaintiff's claims.

60.    During the relevant period, Valle directly and/or through its control of its affiliates directly sold flexible polyurethane foam throughout the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

**Vitafoam Entities**

61.    Defendant Vitafoam Inc. ("Vitafoam USA") is a privately owned and operated company with its headquarters located at 2215 Shore Drive, High Point, North Carolina 27263.  Vitafoam USA is a part of British Vita Unlimited.  During time periods

relevant to the allegations in this Complaint, Vitafoam USA directly and/or on behalf of British Vita Unlimited and/or affiliates it controlled directly manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

62.    Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a private company with its principal place of business at 150 Toro Road, North York, Ontario, M3J 2A9, Canada. Vitafoam Canada is a part of British Vita Unlimited. During time periods relevant to the allegations in this Complaint, Vitafoam Canada directly and/or on behalf of British Vita Unlimited manufactured and/or directly sold polyurethane foam; Vitafoam Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam Canada otherwise engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

63.    Defendant British Vita Unlimited ("Vitafoam UK") is a company organized and existing under the laws of the United Kingdom, its principal place of business is in London, United Kingdom, and its ultimate parent is Vita Cayman Limited which is located in Grand Cayman. Vitafoam UK controls The Vita Group, which includes among its members Vitafoam USA and Vitafoam Canada (along with companies producing polyurethane foam operating in European countries including England, France, Germany, and the Netherlands). During time periods relevant to the allegations in this Complaint, Vitafoam UK, through its domination and control over Vitafoam USA

and Vitafoam Canada, manufactured and/or sold polyurethane foam to Plaintiff and/or others in the United States and/or elsewhere; Vitafoam UK was a conduit or source of information for Vitafoam USA and/or Vitafoam Canada about the conspiracy, including the production, pricing or sale of polyurethane foam in Europe and/or elsewhere, Vitafoam UK communicated directly or through others with Defendants and/or co-conspirators in the furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Vitafoam UK otherwise engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

64.    Vitafoam USA, Vitafoam Canada and Vitafoam UK were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

65.    Alternatively, Vitafoam UK was a member of the conspiracy alleged in this Complaint because of, among other reasons, and upon information and belief, Vitafoam USA and Vitafoam Canada's respective status during time periods relevant to these allegations as the alter ego or agent of Vitafoam Canada with respect to, among other things: (i) the prices at which Vitafoam USA and/or Vitafoam Canada sold polyurethane foam; (ii) the hiring and firing of officers or members of the Board of Directors of Vitafoam USA and/or Vitafoam Canada; (iii) the budget for Vitafoam USA and/or Vitafoam Canada; (iv) the capitalization of and/or loans to Vitafoam USA and/or Vitafoam Canada; (v) the transfer of officers or employees between Vitafoam UK and Vitafoam USA and/or Vitafoam Canada; (vi) financial benefits provided to officers or

employees of Vitafoam USA and/or Vitafoam Canada; (vii) the business plan or operation of Vitafoam USA and/or Vitafoam Canada; (viii) the fact that officers or employees of Vitafoam UK communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Vitafoam USA and/or Vitafoam Canada; (ix) the use by Vitafoam UK of Vitafoam USA and/or Vitafoam Canada as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere which Vitafoam UK used to make sure that Vitafoam USA charged Plaintiff and/or others supracompetitive prices for polyurethane foam; and/or (x) the unified marketing image of Vitafoam UK and Vitafoam USA and/or Vitafoam Canada, including common branding products and/or common corporate logos, insignias or other marks.  Vitafoam UK dominated or controlled Vitafoam USA and Vitafoam Canada with respect to conspiracy activities alleged in this Complaint.

66.    Vitafoam USA, Vitafoam Canada and Vitafoam UK are individually and collectively referred to in this Complaint as "Vitafoam" or the "Vitafoam Defendants."

67.    During time periods relevant to these allegations, Vitafoam manufactured and/or sold polyurethane foam for bedding, furniture, automotive and other applications.

**Woodbridge Entities**

68.    Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a corporation organized and existing under the laws of the State of Michigan with its principal place of business at 1515 Equity Drive, Troy, Michigan 48084.  Woodbridge S&E is part of The Woodbridge Group which itself is a member of the World Polyurethane Alliance.  During time periods relevant to the allegations in this Complaint,

Woodbridge S&E, directly, through Woodbridge Foam Fabricating, Inc. and/or on behalf of Woodbridge Canada and/or The Woodbridge Group manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

69.    Defendant Woodbridge Foam Fabricating, Inc. ("Woodbridge Fabricating") is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business at 1120 Judd Road, Chattanooga, Tennessee 37406. Woodbridge Fabricating is a joint venture between The Woodbridge Group and Inoac Corp.  During time periods relevant to the allegations in this Complaint, Woodbridge Fabricating, directly, through or on behalf of Woodbridge S&E, or on behalf of Woodbridge Canada or The Woodbridge Group manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States, and engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

70.    Woodbridge S&E and Woodbridge Fabricating are collectively referred to in this Complaint as "Woodbridge USA."

71.    Defendant Woodbridge Foam Corporation ("Woodbridge Canada") is a Canadian corporation with its headquarters at 4240 Sherwoodtowne Boulevard, Mississauga, Ontario L4Z 2G6, Canada.  Woodbridge Foam is a member of the "World Polyurethane Alliance," a group of leading urethane manufacturers offering "world-class" manufacturing.  Woodbridge Canada is part of The Woodbridge Group, and the reference in this Complaint to "Woodbridge Canada" includes The Woodbridge Group.

Woodbridge Canada and The Woodbridge Group share the same corporate headquarters. During time periods relevant to the allegations in this Complaint, Woodbridge Canada directly, on behalf of The Woodbridge Group, and/or through Woodbridge USA manufactured and/or directly sold polyurethane foam to Plaintiff and/or others in the United States; Woodbridge Canada communicated directly or through others with Defendants and/or co-conspirators in furtherance of the conspiracy regarding polyurethane foam production, pricing or sale in the United States and/or elsewhere; and Woodbridge Canada otherwise engaged in the unlawful conduct described in this Complaint in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

72. Woodbridge USA and Woodbridge Canada were each members of the conspiracy alleged in this Complaint because of, among other reasons, their respective participation in the conspiracy through the actions of their respective officers, employees and representatives.

73. Alternatively, Woodbridge Canada was a member of the conspiracy alleged in this Complaint because, among other reasons, upon information and belief, Woodbridge USA's status during time periods relevant to these allegations as the alter ego or agent of Woodbridge Canada as evidenced by Woodbridge Canada's domination or control over Woodbridge USA with respect to, among other things: (i) the prices at which Woodbridge USA sold polyurethane foam; (ii) the hiring and firing of officers, employees or members of the Board of Directors of Woodbridge USA; (iii) the budget for Woodbridge USA; (iv) the capitalization of and/or loans to Woodbridge USA; (v) the transfer of officers or employees between Woodbridge USA and Woodbridge

Canada; (vi) financial benefits provided to officers or employees of Woodbridge USA; (vii) the business plan or operation of Woodbridge USA; (viii) the fact that officers or employees of Woodbridge Canada communicated with, serviced or called on purchasers of polyurethane foam despite the presence or with the knowledge of Woodbridge USA; (ix) the use by Woodbridge Canada of Woodbridge USA as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale or production of polyurethane foam in the United States and/or elsewhere to make sure that Woodbridge USA charged Plaintiff and/or others supracompetitive prices for polyurethane foam; and/or (x) the unified marketing imaging of Woodbridge Canada and Woodbridge USA, including common branding products and/or common corporate logos, insignias or other marks. Woodbridge Canada dominated or controlled Woodbridge USA with respect to conspiracy activities alleged in this Complaint.

74. Woodbridge USA and Woodbridge Canada are individually and collectively referred to in this Complaint as "Woodbridge" or the "Woodbridge Defendants."

75. During time periods relevant to these allegations, Woodbridge manufactured and/or sold polyurethane foam for automotive and other applications.

76. The corporate Defendants identified above participated in the conspiracy alleged in this Complaint by and through the actions of their respective officers, directors, employees and/or agents, each of whom was acting within the scope and course of his/her employment when engaging in conduct in furtherance of the polyurethane foam conspiracy. Alternatively, each corporate Defendant negligently

failed to implement sufficient controls to detect and prevent the conduct by its officers, directors, employees and/or agents challenged in this Complaint.

### III.     AGENTS AND CO-CONSPIRATORS

77.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

78.     Each defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.  Each defendant that is a subsidiary or affiliate of a foreign parent acts as the United States agent for polyurethane foam and/or polyurethane foam products made by its parent company.

79.     Vitafoam has admitted that "a number of raw material suppliers had an interest in foam companies raising prices and . . . served as conduits for information to be disbursed among certain Defendants."   Upon information and belief, other companies and natural persons not named as Defendants in this Complaint combined or conspired with Defendants and committed acts in furtherance of the unlawful conspiracy that is alleged in this Complaint, including, but not limited to, Advanced Urethane Technologies, Inc. ("AUT").

80.     Plaintiff reserves the right to amend this pleading to add such co-conspirators as named Defendants based upon further investigation and discovery.

## IV.    PRODUCT

81.    Polyurethane foam is primarily used as a cushioning material in bedding (e.g., mattresses), furniture (e.g., upholstered furniture), flooring underlay, and transportation applications.

82.    Polyurethane foam generally can be grouped into three main product segments:  (1) block foam, also known as commodity or slabstock foam, which is poured and then cut for use in such products as furniture and bedding and in automotive applications such as headliners, seat cover sets, door panels and parcel shelves, textile lamination, and insulators in the gas tank, trunk lining, instrument panels, package trays, transmission shift, and engine covers; (2) molded foam, which is fabricated for use in, among other things, automobile products such as seating systems, headrests, steering wheels, armrests, and consoles; and (3) carpet underlay, made primarily from scrap flexible foam.   By contrast, "rigid" or "technical" foam is primarily used in construction for insulation purposes.

83.    Polyurethane foam is typified by open cells that make the end product soft, light, resilient, and breathable.   It is normally produced from a mixture of polyols and di- and/or poly- isocyanates, such as toluene diisocyanate ("TDI").

84.    In 2010, domestic revenue for the polyurethane foam industry was projected at $12 billion.   Typically, flexible polyurethane foam (including slabstock, molded, and carpet underlay) averages between 70-85% of the total output of all polyurethane foam in the United States.   In 2009, polyurethane foam for furniture and bedding products accounted for approximately 38% of polyurethane foam sales revenue; polyurethane foam for transportation products accounted for approximately

32% of polyurethane foam sales revenue; polyurethane foam for flooring products accounted for approximately 25% of polyurethane foam sales revenue; and polyurethane foam for other end use—including but not limited to packaging and textiles—accounted for approximately 5% of polyurethane foam sales revenue.

85.    The structure of the polyurethane foam manufacturing market is conducive to cartelization for a variety of reasons, including, without limitation, one or more of the following:

(a)    Polyurethane foam is a commodity product or has commodity-like characteristics (one that is readily interchangeable and for which competition is primarily driven by price rather than other market pressures, such as branding and marketing) used in hundreds of consumer products to provide comfort, support, safety, and durability. Polyurethane foam is interchangeable across manufacturers. The last major technological breakthroughs in the production of polyurethane foam occurred in the mid-1900s, and polyurethane foam is now classified as a commodity chemical production. Accordingly, each Defendant has the capability to produce the same or similar polyurethane foam products, and polyurethane foam customers make purchase decisions based principally on price. The commoditization and interchangeability of polyurethane foam facilitated Defendants' conspiracy.

(b)    The demand for polyurethane foam is relatively inelastic.

(c)    The market for the manufacture of polyurethane foam is concentrated in a small number of sellers. While firms with collectively less than a substantial market share can unlawfully conspire to fix prices and/or allocate business, in this case Defendants accounted for approximately 80% of the United States

production of polyurethane foam during time periods relevant to the allegations in this Complaint. The market for the domestic supply of polyurethane foam has become increasingly concentrated over the years due to acquisitions and the sale of plants. For example, in the late 1980s, there were a number of mergers and acquisitions, including acquisitions by Foamex and Ohio Decorative Products. In about December 1997, Foamex acquired Crain Industries, which at the time was the third-largest polyurethane foam slabstock producer. In July 2001, Foamex acquired assets of General Foam, including its East Rutherford, New Jersey plant. In 2005, Ohio Decorative acquired Nu-Foam. In 2006, following the purchase of its parent corporation, Vitafoam U.S. sold one of its plants to Olympic Products LLC, a joint venture between Woodbridge and Hickory Springs, and another plant to Flexible Foam. In 2007, Carpenter acquired its European competitor Dumo NV.

(d)     To enter the business of producing flexible polyurethane foam requires significant time and cost, and includes substantial start-up capital expenditures, setting up sources of supply, building manufacturing facilities, creating a distribution network, environmental compliance, and other hurdles.

(e)     The process to manufacture polyurethane foam is a chemically-sensitive operation which requires the control of formulation ingredients including Polyols, Isocyanates, silicone surfactant, catalysts and blowing agents.

(f)     The cost to import polyurethane foam manufactured from overseas to the United States makes substitution of foreign polyurethane foam commercially infeasible.

(g)    There are no commercially reasonable substitutes for polyurethane foam because of, among other reasons, application specifications and quality standards.

## V.    TRADE AND COMMERCE

86.    During time periods relevant to the allegations in this Complaint, Defendants and their co-conspirators engaged in business that affects or is within the flow of interstate commerce, and the effect of that business on interstate commerce is substantial.    In particular, the activities of Defendants and their co-conspirators are within the flow of interstate and foreign commerce or have a substantial effect upon interstate commerce in that:

(a)    Defendants and their co-conspirators sold and shipped substantial quantities of polyurethane foam in a continuous and interrupted flow in interstate commerce to customers located in states other than the states in which the Defendants produced the polyurethane foam.

(b)    Data, information, correspondence and/or financial material were exchanged between each Defendant in the state in which each is located, incorporated, or has its principal place of business and other states.

(c)    Money flowed between banks outside of the state in which each Defendant is located, incorporated, or has its principal place of business and other states.

87.    The effect of Defendants' and/or their co-conspirators' anticompetitive conduct on United States commerce gives rise to Plaintiff's claims.

## VI.    OVERT, UNLAWFUL ACTS IN SUPPORT OF THE ALLEGED ANTITRUST VIOLATIONS

### A.    Scope of the Conspiracy

88.    Beginning as early as approximately January 1, 1999, and continuing until at least July 2010, with an impact that continues thereafter, Defendants and their co-conspirators entered into a continuing conspiracy not to compete on the sale of polyurethane foam sold to Plaintiff and others in the United States and elsewhere.

89.    The allegations in this Complaint detail unlawful conduct and provide examples of insights into how Defendants' and their co-conspirators' conspiracy operated and the scope of their cartel.  However, as alleged below, Defendants and their co-conspirators fraudulently concealed their conspiracy from Plaintiff and others for years.  Thus, not surprisingly, discovery will be needed in this case to reveal the full scope and effect of the polyurethane foam conspiracy.  However, in addition to the allegations above, other compelling direct evidence of the conspiracy and the plausibility of Plaintiff's antitrust claims surfaced in July 2010 when law enforcement authorities from the United States Department of Justice ("DOJ"), the Canadian Competition Bureau ("CCB"), and the European Commission ("EC") executed coordinated raids on Defendants and their co-conspirators as part of Government investigations into alleged cartel activities among polyurethane foam manufacturers and distributors.[1]  Upon information and belief, the DOJ, CCB and EU opened those investigations when Vitafoam voluntarily and secretly came forward in February 2010

---

[1] For example, the Carpenter Defendants' offices in Europe were among those raided by the EC.

and confessed to its participation in the conspiracy and agreed to cooperate with law enforcement agencies in their subsequent investigations.

90.    To obtain the search warrant on Defendants, the United States had to demonstrate to a Magistrate Judge that there was probable cause, recounted in a sworn affidavit or testimony grounded on reasonably trustworthy information, that it would obtain evidence of an antitrust violation as a result of executing the search warrant. That is, the United States had to have evidence sufficient to warrant a person of reasonable caution to believe that raiding the offices of a seemingly lawful business would uncover evidence of antitrust violations.

91.    The fact that Vitafoam (or such other amnesty applicant) had to confess to its involvement in criminal antitrust conduct regarding the polyurethane foam cartel in order to qualify for leniency in the first instance is direct evidence of the conspiracy and the plausibility of Plaintiff's antitrust claims in this case.

(a)    The DOJ's Corporate Leniency Policy provides in part that for a corporation to obtain leniency regarding illegal antitrust activity, it must among other steps, report the wrongdoing, the "confession" must be truly a corporate act as opposed to isolated confessions of individuals, and the corporation must cooperate with DOJ's investigation.    *See  www.justice.gov/atr/public/guideliens/0091.htm.*    In particular, a leniency applicant "must admit its participation in a criminal antitrust violation involving price fixing, bid rigging, capacity restriction, or allocation of markets, customers or sales or production volumes before it will receive a conditional leniency letter."    *See www.justice.gov.atr/public/criminal/239583.htm at 5.*

(b)    The CCB's Immunity Program provides in part that "[a] party implicated in criminal anti-competitive activity … may offer to cooperate with the [CCB] and request immunity."    The CCB's Immunity Program falls under Canada's Competition Act, which prohibits conspiracies, agreements or arrangements between competitors or potential competitors to fix prices, allocate markets or restrict the supply of a product.

(c)    The EC's corporate Leniency Program requires among other acts that an applicant provide the EC with a detailed description of the alleged cartel arrangement, including its aims, activities, functioning, participants and products to qualify from immunity from fines.

92.    In addition to Vitafoam's admission that it participated in the polyurethane foam conspiracy, Vitafoam's cooperation with the DOJ and the CCB has, upon information and belief, yielded additional direct evidence of the cartel in the form of documents, information, and secretly recorded telephone conversations with or telephone messages from Vitafoam co-conspirators.  On the basis of that cooperation, the CCB states that he "truly believe[s] that the information provided by [Vitafoam's witnesses] is true . . . ."

93.    The telephone conversations and telephone messages which Government law enforcement authorities secretly recorded with Vitafoam's cooperation from approximately May 2010 through June 2010 provide a revealing insight into the cartel's operation.  For example:

(a)    On May 12, 2010, Bruce Schneider of Future Foam called the President of Vitafoam asking about Vitafoam's plans for a polyurethane foam price

increase.    This call illustrates how the conspirators agreed upon, monitored and exchanged their polyurethane foam price increase announcements in advance of informing their customers.    Mr. Schneider explained on the call that "everything is postponed to May 31st or June 1st.    There is a [price announcement] letter out from Carpenter for [the] 31st of May.    There is a letter out from Flexible for June 1st.    Foamex sent a letter two weeks ago at 15% but it looks like now that the increase is going to be 10 and 12% on foam."    Vitafoam's President asked Mr. Schneider whether he was "hearing anything from the other guys [*i.e.*, co-conspirators]" or "is it just kinda market stuff?", to which Mr. Schneider replied: "Yeah, we are hearing 10-12 . . . It's kinda what we hear from the other people what they expect.    Ya know, it would have been great to get 20% but I don't think so.    If you hear anything from your friends in Europe … I sure would like to know that as well."    The conspiracy price increase ultimately was 9%, and on June 10, 2010, Mr. Schneider left a voice mail message for Vitafoam's President asking him to call back because he (Mr. Schneider) had "information of why the increase changed from 10 to 12 to 9."

(b)    Another call between conspirators reveals their exchange and use of polyurethane foam price increase letters to implement and monitor the conspiracy. On June 3, 2010, Dean Bryiannis of Valle Foam called Vitafoam's Vice President and had the following conversation:

> Brayiannis:    I sent you a text regarding price increase letters.  I'm assuming you've got most of the ones that you wanted to see.
>
> Vitafoam:    I didn't see, I had the old boy [one of Vitafoam's sales representatives] had faxed me one from a couple of days ago … Yah, ok, no problem. … [I]t's game on again, isn't it.

Brayiannis:    [A]h, we'll see what happens.  I've got Carpenter, Flexible, Mohawk, Leggett.

Vitafoam:      but it's warranted, you know what I mean.  Like, we know the prices of raw material have been going up, so ah.

Brayiannis:    Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do.

Vitafoam:      … [L]ike I say, it's game on.  So I would imagine that most manufacturers will move forward with it.  We will have to see whether … they do or not and see how it goes.

Brayiannis:    Yah, yah.  All right.  Well our letter is out so hopefully I'm assuming you're probably put something out by now.

Vitafoam:      … [I]t's as good as done.

:    … [I]t's as good as done.

Brayiannis:    Ok.  Well we're already out, so we've already put our letter out.

(c)    A June 4, 2010 telephone message from Vitafoam's Tim Prescott to a Vitafoam cooperating witness shows how conspirators coordinated prospective polyurethane foam price information:

Hey, it's Tim.  … Can you give me a call when you get a chance.  I don't know whether you've spoken to [Vitafoam's President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're going with the price increase and he just called me again asking can VPS please call John Howard over at Domfoam.

94.    The Vitafoam tapes clearly show that the conspirators knew that by conspiring not to compete on the sale of the polyurethane foam, they were keeping polyurethane foam prices to their customers higher than they would have been in the absence of collusion.  Conspirators rarely, if ever, admit to overcharging their customers

when confronted with their unlawful conduct after the fact.  But at the time of the Vitafoam taped calls, upon information and belief, Vitafoam's co-conspirators did not know that in February 2010, Vitafoam had turned itself in, had exposed the conspiracy to and was cooperating with law enforcement officials, and was legally required to start competing for previously allocated accounts if it wanted to qualify under the various Government leniency programs.  As a result, when Vitafoam salespeople began soliciting polyurethane foam business from accounts previously allocated to conspirators, at least one of those conspirators, John Howard of Domfoam, called a cooperating Vitafoam witness on May 20, 2010, and complained about the poaching in the sort of highly incriminating manner that usually occurs only when one does not know that he is being tape-recorded:

> Howard:  Your [Vitafoam] fellow in Montreal here has been out, has his salesman Claude Robinson out knocking on doors they've never knocked on before, selling at or quoting at low low prices.  If he wants a battle, I'll give him a battle … These guys have been in at accounts they've never sold at … if he wants a battle, he's got one.  We will start going after his accounts and it won't be pretty.  We'll both end up hurting. … I'm pissed off and our sales guys are pissed off and they're saying:  "John, are you going to do something about this, or are you just going to let this guy keep quoting low prices and taking business away from us."  So I'll let the dogs loose or I don't let the dogs loose.  Want to mull it over and give me a shout back.

95.    On May 25, 2010, Vitafoam's cooperating witness returned Mr. Howard's call and Mr. Howard made the following additional incriminating statements:

> Howard:  Just, you know we've kind of stayed out of each other's way for some time here while business is quiet.  There's just no business to be had and ***dropping prices is only going to benefit the customers.***  I can't afford to have him take stuff away … It'll be rough go if he wants to go and quote prices in places where he's not currently selling … Tell Normand [Vitafoam's salesman] it's a, I mean we just don't even know who your accounts are.  Basically we've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't

currently sell, we're going to go after his accounts.  So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on.  But the guys are asking me-you are always telling us to stay away.  We do the same thing with Foamex, we don't go after their accounts, haven't for a while.  Business is [sic] been in the shitter, just kind of stayed away and they stayed [away] from our accounts two so prices have been pretty stable.  It's just, you know, there ain't much business out there and ***dropping prices only the customers are going to benefit.***  But let him make his decision and it if is to continue going after them then there'll be some consequences.  That's it.  I'm not gonna … no [big] threats but I can't not do anything.  (Emphasis added.)

96.    Although the Vitafoam taped calls cover only a few months of the conspiracy in 2010, they reveal that the cartel included the United States and polyurethane foam sold in the United States.  For example, and without limitation:

(a)    At least three telephone calls in connection with the Vitafoam conspiracy tapes involved conspirators located in the United States at the time of the calls.  On May 12, 2010, Bruce Schneider of Future Foam, located in the United States, called Vitafoam and discussed a prospective polyurethane foam price increase.  On May 27, 2010, a Vitafoam cooperating witness dialed 828-328-2201 (a North Carolina, United States telephone number) and spoke to Lee Lunsford at Hickory Springs in North Carolina.  On the call, they discussed among other subjects costs for inputs to manufacture polyurethane foam and the timing of polyurethane foam price increases.  On June 10, 2010, Bruce Schneider of Future Foam, using the Iowa, United States telephone number 712-323-9122, called a Vitafoam cooperating witness and left a message: "If you want to give me a call I've got information of why the [polyurethane foam price] increase changed from 10 to 12 to 9 [percent]."

(b)    Some of the taped Vitafoam telephone calls discussed in part the United States polyurethane foam market, conspirators physically located in the United

States, or United States polyurethane foam customers.  For instance, on June 15, 2010, Michel Legendre of Carpenter called a Vitafoam cooperating witness to discuss the conspiracy.  Mr. Legendre stated in part that polyurethane foam prices have "gone up in the States.  Leggett went up . . . Leggett's the one that's going up first this time in the US  . . . ."  Mr. Legendre then sent Vitafoam's witness a facsimile containing a copy of Carpenter's polyurethane foam price increase letter that was to be sent to customers the next day.

(c)    The CCB's sworn search warrant applications state that conspiracy meetings often coincided with the bi-annual meetings of the Polyurethane Foam Association ("PFA"), at least some of which occurred in the United States.  *See, e.g.,* May 26-27, 2010 PFA meeting in Baltimore, Maryland.  Conspirators located in the United States were members of the PFA, and some conspirators located outside the United States (*e.g.*, Canada) were regular guests at the PFA meetings.

(d)    Robert Woodbridge, the Chief Executive Officer of Woodbridge's Canadian operation, exchanged information with a Vitafoam cooperating witness regarding an increase in the price of polyurethane foam in the United States.

(e)    The CCB's sworn search warrant applications characterize the polyurethane foam conspiracy as "international in nature."

(f)    Some Defendants manufactured polyurethane foam in the United States and delivered it in Canada.  For example, and without limitation, during time period relevant to the allegations in this Complaint: (1) Foamex sold polyurethane foam which it manufactured at a plant in Seattle, Washington and delivered it to one or more customers in Canada; (2) Flexible Foam sold polyurethane foam which it produced at a

plant in Portage, Wisconsin and delivered to one or more customers in Canada; and (3) Carpenter USA sold polyurethane foam which it manufactured at a U.S. Carpenter plant and delivered to one or more customers in Canada.

97.     Under the terms of their conspiracy, Defendants and their co-conspirators artificially increased, fixed, maintained and/or stabilized prices of polyurethane foam sold to Plaintiff and others at levels above those that would have existed in the absence of collusion; allocated polyurethane foam accounts, including Plaintiff, among themselves; and/or they restricted the supply of polyurethane foam for sale to Plaintiff and others.

98.     At times during the conspiracy, Defendants and their co-conspirators used claimed changes in the cost of raw materials to manufacture polyurethane foam, including Polyols and/or Isocyanates, as a pretext to collusively increase, fix, maintain and/or stabilize the price of polyurethane foam sold to Plaintiff and others.  In those situations, when Defendants' and their co-conspirators' raw materials suppliers announced price increases for chemical ingredients such as Polyols or Isocyanates, Defendants and their co-conspirators communicated and/or coordinated with each other to use those cost increases as a "cover" to collusively and unlawfully increase prices of polyurethane foam sold to Plaintiff and others.  Alternatively or additionally, during those and/or other times during the conspiracy, the prices which Defendants' and their co-conspirators charged Plaintiff and others for polyurethane foam were higher than they would have been in the absence of collusion.

99.     Defendants and their co-conspirators implemented and monitored compliance with their conspiracy through in-person meetings, including meetings under

"cover" of trade associations such as the Polyurethane Foam Association (of which U.S. polyurethane foam manufacturers were members and Canadian polyurethane foam manufacturers were regular guests); telephone conversations; and written exchanges (including, without limitation, draft price increase announcements) via facsimile, email or in person.

100.    As part of their conspiracy, Defendants and their co-conspirators exchanged information about prospective prices of or price increases in polyurethane foam and/or the allocation of polyurethane foam customers among themselves.  These communications in furtherance of the conspiracy included the exchange of draft price increase announcements for polyurethane foam sold in the United States and/or elsewhere, and/or discussions in advance about the percentage or amount by which Defendants and/or their co-conspirators were going to increase prices of polyurethane foam sold in the United States and/or elsewhere.  For example, and without limitation:

(a)    As Vitafoam has admitted, during the conspiracy period, the following Vitafoam officers and employees engaged in conduct in furtherance of the conspiracy alleged in this Complaint, including without limitation:[2]

| | |
|---|---|
| Peter Farah | Bill Lucas |
| Fil Fonseca | Stan Miller |
| Ted Giroux | George Newton |
| David Gurley | Gerry Hannah |
| Rik Hennink | Frank Roncandin |
| Mel Himmel | |

(b)    As Vitafoam has admitted, during the conspiracy, Vitafoam officers or other employees had oral and/or written communications (*e.g.*, emails, draft price

---

[2]  The list of names and events which follow is not an exhaustive list of either all people who participated in and/or had knowledge of the conspiracy or of all cartel activities.

announcements) in furtherance of the conspiracy alleged in this Complaint with, among others and without limitation:

| | |
|---|---|
| Carpenter | Mark Kane and Max Tenpow |
| Domfoam | John Howard |
| Flexible Foam | Michael Crowell |
| Foamex | Vincent Bonaddio, Tony Da Costa, Doug Cauphin, Donald Phillips and Al Zinn |
| Future Foam | Robert Heller and Bruce Schneider |
| Hickory Springs | Don Coleman, Todd Councilman, Lee Lunsford, Buster Mann and Don Simpson |
| Scottdel | Jeff Carter |
| Valle | Dean Brayiannis, Robert Valle and Tony Vallecoccia |
| Woodbridge | Robert Magee |

(c)     As Vitafoam has admitted, during the conspiracy alleged in this Complaint, a Vitafoam witness – who is now believed to be cooperating with law enforcement authorities – had conversations about price increases and customer allocation in furtherance of the cartel with, among others, and without limitation:  Vincent Bonadio and Don Phillips of Foamex; Tony Vallecoccia (President) of Valle; John Howard (President) of Domfoam; Todd Councilman (Marketing-Sales Manager) of Hickory Springs; Mike Crowell (Vice President, Sales and Marketing) of Flexible Foam; and Mel Himel of Vitafoam.

(d)     In June 2000, the Vitafoam Vice President – who at the time was a Woodbridge employee – sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex, to which the Vitafoam salesperson responded: "Yes,

we told him we are going out with our letters 12% effective July 30th [on polyurethane foam prices], he said we would follow."

(e)     As admitted by Vitafoam, in October and November 2004, the Vitafoam Canada Vice President (then at Woodbridge) emailed his Woodbridge supervisor that he (the Vitafoam Vice President) had had discussions with Bill Lucas, acting for Vitafoam and Crest, regarding an agreement to increase polyurethane foam prices effective January 1, 2005.

(f)     On or about October 21, 2004; November 2, 2004; and March 9, 2005, the Vitafoam Vice President – while a Woodbridge employee – informed his Woodbridge supervisor in substance that he and Vitafoam's Lucas had met to collude on polyurethane foam prices, including the amount and timing of price increases, and he was reaching out to Foamex to collude on polyurethane foam prices as well.

(g)     On March 9, 2005, the Vitafoam Vice President – while a Woodbridge employee – emailed his Woodbridge supervisor regarding another call with Bill Lucas, representing Vitafoam and Crest.  The Vitafoam Vice President wrote: "Spoke with Lucas again last week.  We are trying to meeting [sic] in Chattanooga."  He also wrote: "We use the schedule[d] discussions to lead into the real reasons for the calls.  Said that they were successful at the mills, in Furniture – they were still one [price increase] behind."

(h)     On May 5, 2005, the Vitafoam Vice President, while an employee at Woodbridge, emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005.  This relationship between Woodbridge, Crest and Vitafoam continued for years.  In a June 2, 2010

conversation between the Vitafoam Vice President and the current Vitafoam President, they again discussed Mr. Mehta and information to pass to him in furtherance of the conspiracy.

(i)    On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive (then at Woodbridge) and stated: "In separate conversation, I talked to Lucas. They are out with 11% on blocks nothing on Auto." He asked the Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today." After placing the call to Mann, the Vitafoam employee wrote: "I called Buster yesterday. We spoke about the bedding stuff. It is at numbers we are not used to."

(j)    On May 22, 2008, Nikki Walborn of Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter. (Within a year of this email, Jeff Carter went from Scottdel to Future Foam). On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the email and price increase letter to his superior at Vitafoam, the then-current President of Vitafoam.

(k)    On July 7, 2008, Jeff Carter of Scottdel emailed a draft price increase letter to David Gurley of Vitafoam. Steve Prescott of Vitafoam ultimately received a copy of the Scottdel price increase email through internal Vitafoam email communications and forwarded it to Vitafoam's Stan Miller and asked him (Miller) to "[c]heck with your Carpenter contact to see when they plan on pulling the trigger [on the polyurethane foam price increase]." On or about July 11, 2008, Stan Miller of Vitafoam

emailed Steve Prescott of Vitafoam stating that "Dan from Carpenter just called and said they will be going up 13% on Aug. 11, 2008."

(l)     In April 2009, Defendants and their co-conspirators announced a polyurethane foam price increase which they had coordinated in advance.  As part of that collusive price announcement, the head of Vitafoam's U.S. and Canadian logistics received a Future Foam polyurethane foam price increase announcement before Future Foam sent it to its customers.  The Vitafoam employee shared the announcement with others at Vitafoam who participated in the conspiracy, including Vitafoam's National Sales Manager, who sent the Future foam price increase announcement to Dean Brayiannis at Valle with the comment: "Who treats you better than me?"

(m)     On May 21, 2009, David Gurley of Vitafoam forwarded via email a draft price increase letter to Jeff Carter.  Mr. Carter, in turn, forwarded the Gurley email to David Carson and Louis Carson of Scottdel and stated: "You probably have seen all these.  It's crazy out there again, personally I don't think this is enough of an increase."

(n)     Collusive polyurethane foam price increases occurred effective in or about, among other dates, May 2009 and June 2009.  In furtherance of those collusive polyurethane foam price increases, and/or to monitor compliance with the unlawful agreement among Defendants and their co-conspirators, Vitafoam collected in its files price announcements by its co-conspirators reflecting these (and other) conspiracy price increases, including without limitation, a Flexible Foam price announcement dated April 7, 2009, a Mohawk price announcement dated April 10, 2009, a Carpenter price announcement dated April 13, 2009, a Vitafoam Canada price announcement dated April 14, 2009, a Leggett price announcement dated April 14,

2009, a Future Foam price announcement dated April 16, 2009; Mohawk, Flexible Foam, Carpenter and Future Foam price announcements each dated May 18, 2009; and Leggett and Vita Canada price announcements dated May 19, 2009.

(o)    On or about May 26-27, 2010, a Vitafoam employee participating in the conspiracy attended the Polyurethane Foam Association meeting in Baltimore, Maryland, where he met with Michael Crowell of Flexible Foam and they discussed polyurethane foam prices.

101.    The answers of the Vitafoam corporate defendants to the Consolidated Amended Class Action Complaint ("CAC") filed September 26, 2011 in MDL 2196, (Docket No. 274) including, but not limited to, the following excerpted quotes, concede the existence of this conspiracy:

(a)    Vitafoam communicated and reached understandings on the percentage amount and timing of price increases and market allocation in the sale of polyurethane foam (Vitafoam Answer to CAC, September 26, 2011, ¶ 63);

(b)    understandings reached by the Vitafoam Defendants were the result of telephone conversations, exchanges of price increase letters, face-to-face meetings, and bilateral discussions among certain competitors (Id., ¶ 65);

(c)    understandings reached by the Vitafoam Defendants were the result of discussions among certain competitors about the percentage of price increases and the date of the increases, and that price increase announcement letters were mailed to customers that sometimes reflected these understandings (Id., ¶ 66);

(d)    a former president for one of the Vitafoam Defendants engaged in communications with certain Defendants in which they discussed and reached a

number of understandings on price increases and effective dates of such increases (Id., ¶ 68);

(e)     personnel of the Vitafoam Defendants, including Steve Pendock, Gerry Hannah, David Gurley, Frank Roncadin, George Newton and Fil Fonseca, participated in these discussions with other Defendants to share information on price increases (Id., ¶ 70);

(f)     discussions relating to price increases with other Defendants were conducted primarily by means of telephone, electronic mail, and in-person meetings, the latter occurring sometimes at Polyurethane Foam Association ("PFA") meetings (Id., ¶ 71);

(g)     these discussions included Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex; Max Tenpow of Carpenter; Bruce Schneider of Future Foam; Don Coleman of Hickory Springs; and Robert Valle and Dean Brayiannis of Valle (Id., ¶ 72);

(h)     a Vitafoam Defendant had discussions with other Defendants on the amount and effective date of price increases that led to understandings about the price increases; and that when understandings were reached, the objective was to pass on cost increases to customers (Id., ¶ 81);

(i)     a Vice President of a Vitafoam Defendant personally had a number of discussions about price increases with Woodbridge, Vitafoam, Inc., Foamex, Hickory Springs, Valle, and Flexible Foam, and that some co-workers at Woodbridge and the Vitafoam Defendants also participated in a number of similar discussions (Id., ¶ 82);

(j)     the President of Vitafoam Canada participated in a number of discussions concerning price increases in the flexible polyurethane foam market with

competitors, including Bill Lucas of Vitafoam, Inc., Donald Phillips at Foamex, Michael Crowell of Flexible Foam, Tony Vallecoccia of Valle, and Lee Lunsford of Hickory Springs.  In addition, the Vitafoam Defendants admit that David Gurley forwarded an email from Don Simpson of Hickory Springs to the current President of Vitafoam Canada that contained price increase letters from competitors (Id., ¶ 92); and, with competitors about price increases (Id., ¶ 112).

102.   Defendants exchanged emails with competitors to discuss or share information about price increases, and/or sent emails internally that described conversations.

### B.    Evidence Obtained by the Canadian Commissioner of Competition

103.   Information sworn under oath on July 21, 2010 by Pierre-Yves Guay of the Commissioner of Competition in Canada in support of a search warrant references information provided by "Witness A."  "Witness A" is the current president of Vitafoam, and the information pertains to conduct "in Canada and in the United States."  The information sworn to under oath by Mr. Guay provides that: "Witness describes himself as someone who gathers and shares information across the foam sectors.  Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|-----------|----------|-----------|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |

| | | |
|---|---|---|
| Foamex | Don Phillips | Executive Vice President, Automotive Parts Division |
| Vallefoam | Tony Vallecoccia | President |
| DomFoam International Inc [sic] | John Howard | President |
| Ottobock [sic] | John Vins | Sales Manager |
| Plastomer | Bill Baughman | Chief Executive Officer |
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |
| Vita | Mel Himel | President |
| Hickory Springs | Buster Mann | VP, Eastern Division |
| CMI Automotive | Jorge Canamero | President |

**Conduit of information:**[3]

| Companies | Contacts | Positions |
|---|---|---|
| Bondtex Incorporated | Jerry Hightower | President |
| Cerex Fabric | Dan Holsenbeck | Sales Manager |
| Inoac USA | Max Ozeki | VP Foam Division |
| Morbern Inc | John Weaver | VP Sales and Marketing |

---

[3] "Conduit of information means that Witness A had discussions with these individuals who reported market conditions and price increases by alleged cartel members to him.  These discussions were not about price fixing or market allocation but rather represented simply a transmission of information."

104.    Mr. Guay's sworn affidavit states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including Carpenter, Valle, Domfoam, A to Z Foam, Vitafoam, Foamex, Flexible Foam, Future Foam, Mohawk, Scottdel, Broadway Foam, Woodbridge, Leggett & Platt, and Hickory.  The affidavit describes violations of law arising from conduct both "in Canada and in the United States."

### C.    Domfoam and Valle Foam Guilty Pleas

105.    On January 5, 2012, Valle Foam and Domfoam were indicted for conspiring with the Canadian subsidiaries of Carpenter, Foamex, and Vitafoam to fix prices for slab foam from January 1999 through July 2010.  Also on January 5, 2012, Domfoam and Valle Foam pled guilty in Ontario Superior Court to violating Canada's Competition Act for engaging in a conspiracy from January 1999 through July 2010 to fix prices for polyurethane foam products ("generally used in carpet subflooring, furniture upholstery, and bedding products").  Domfoam and Valle Foam agreed to pay a fine of $12.5 million (Canadian) over the next 6 years.   In their Statement of Admissions, Valle Foam and Domfoam admitted their role in the conspiracy, as follows:

> For the purpose of forming and carrying out the alleged conspiracy, Domfoam/Valle, Carpenter, Vita and Foamex established a practice whereby the members of the alleged cartel would communicate about the amount and effective date of price increases in the sale and supply of slab and slab products in Canada.  They would agree to use the same or similar effective dates and the same or similar price increase ranges, which had the overall effect of unduly lessening competition in Canada. The information regarding the price increase percentages and effective dates would be included in the price increase letters sent to customers and would constitute a price baseline, which would be used as a starting point for customer negotiations.

106.    The CEO of Valle Foam and Domfoam, Tony Vallecoccia, filed an affidavit in support of the bankruptcy petition of Valle Foam and Domfoam dated January 23, 2012.  In his affidavit (at ¶¶ 49-50), Mr. Vallecoccia testified to the following:

> From January 1, 1999 to March 11, 2010, Domfoam and Valle Foam committed an indictable offence contrary to s. 45(1)(c) of the Competition Act by conspiring, combining, agreeing or arranging to prevent or lessen, unduly, competition in the sale or supply of slab foam and carpet cushion (underlay) foam products within Canada. From March 12, 2010 to July 27, 2010, Domfoam and Valle Foam also engaged in conduct contrary to ss. 45(1)(a) of the Competition Act, R.S.C. 2009, Chap C-2. s. 410 by conspiring, agreeing or arranging to fix, maintain, increase or control the price for the supply of slab foam and carpet cushion (underlay) foam products within Canada, thereby committing an indictable offence contrary to s.45 (2) of the Competition Act, R.S .C. Chap C-2, s.410.

> This conduct by Domfoam and Valle Foam, in collusion with other major manufacturers in their industry, enabled the manufacturers to coordinate and implement price increases to their respective customers (i.e. customers received price increase letters on or near the same day, with similar or identical percentage increases and effective implementation dates).

107.    In his affidavit, Mr. Vallecoccia stated further that Domfoam and Valle Foam pled guilty when it learned that there were wiretap and documentary evidence detailing the conspiracy as well as a cooperating co-conspirator.    (Id. at ¶ 51). Vallecoccia admitted that "Domfoam and Valle Foam were culpable."  (Id. at ¶ 52).

D.    **Additional Evidence**

108.    Documents that have been produced in Urethanes offer further support of Plaintiff's conspiracy allegations.  For example, in a 2004 email, Leggett executive vice president Joe York reported to Leggett executives, including those responsible for purchases of polyurethane foam, that:

> Foamex confirmed today they saw a Carpenter increase letter announcing a 9% increase effective 6/28/04.  Foamex will have a letter out this week. Supposedly, Future will also have one out this week. Carpenter intends to

increase prices again 8/1/04, depending on the 7/1/04, chemical increase. We should have our letters ready to mail to selected accounts.

109.    Mr. York emailed Leggett executives in a similar fashion on October 17, 2005, stating that: "When I was on the west coast last week I was told Carpenter & Foamex were implementing price increases on buns of 56% effective 11/1/05.  I got this from the Foamex manager so it should be reliable."  Leggett's expense reports contain information indicating that meetings occurred among Leggett's executives and its competitors, and in particular that, five days prior to sending this email, Mr. York met with Bud Silvey of Foamex, a Leggett competitor.

110.    In 2007, Leggett sold the assets of its polyurethane foam business to AUT.  Like Leggett and other Defendants, AUT continued to communicate with competitors regarding the price of polyurethane foam, furthering the understanding and agreement among the competitors in the foam industry to collectively support price increases.  Discussions and decisions about such price increases were held and made in advance of announcements to customers.

111.    At least 18 Leggett employees transitioned to work at AUT, including certain of the same executives who were directly involved in the alleged conspiracy while they worked at Leggett.  Among these was Leggett's executive with responsibility for purchases of polyurethane foam, who took charge of polyurethane sales for AUT. This executive was a direct recipient of Mr. York's emails of 2004 and October 17, 2005 described above, and was thus a participant in the alleged conspiracy.  The executive also engaged in direct discussions with other Defendants' representatives regarding the pricing of flexible polyurethane foam.   Upon information and belief, the executive

continued to engage in the same coordinated price fixing when he took charge of polyurethane sales at AUT.

112.   AUT's subsequent head of polyurethane sales was Mr. Joseph Progar. Mr. Progar was also a former Leggett manager of polyurethane foam.  While he worked for AUT, Mr. Progar, authored letters to customers announcing AUT's price increases of foam products.   Other employees authored price increase letters both when they worked at Leggett and when they came to work at AUT.  At least some of these letters were sent in coordination with price increase letters by other Defendants.

113.   The practice of coordinating price increase letters was longstanding: at least Defendants Vitafoam, Leggett, Mohawk, Flexible Foam, Carpenter, Future Foam, Foamex, AUT, and Scottdell, as well as Defendants Domfoam and Valle Foam, each announced similar price increases in conjunction with their co-conspirators and, upon information and belief, with the prior knowledge of other Defendants' close-to-simultaneous raises.

114.   In addition, as already set forth above, the transitioning of certain former Leggett employees provided Leggett and AUT personnel opportunities to conspire with other foam producers.

### E.     Opportunities to Conspire

115.   Various industry trade organizations and events also facilitated Defendants' illegal conduct.  Representatives of Defendants have regularly met through such organizations as the PFA, International Sleep Products Association (ISPA), Alliance of Flexible Foam, Carpet Cushion Council, and Surfaces, a trade group that includes polyurethane carpet underlay producers.  Defendants discussed the pricing

of flexible polyurethane foam directly with one another at or outside of these formal meetings.

116.   Defendants seized the opportunities to meet in person to allocate customers and coordinate price increases.  PFA members collectively represent 70% or more of the total polyurethane foam production in the United States.  Since 2001, PFA meetings have occurred on at least the following dates in the following locations:

| Date | Location |
|------|----------|
| May 10-11, 2001 | Arlington, Virginia |
| October 17-18, 2001 | New Orleans, Louisiana |
| May 8-9, 2002 | Arlington, Virginia |
| October 16-17, 2002 | Salt Lake City, Utah |
| May 7-8, 2003 | Arlington, Virginia |
| October 8-9, 2003 | Montreal, Quebec |
| May 5-6, 2004 | Washington, D.C. |
| October 20-21, 2004 | Albuquerque, New Mexico |
| May 4-5, 2005 | Washington, D.C. |
| October 5-6, 2005 | Charleston, South Carolina |
| May 3-4, 2006 | Washington, D.C. |
| October 11-12, 2006 | Santa Barbara, California |
| May 23-24, 2007 | Baltimore, Maryland |
| October 3-4, 2007 | Point Clear, Arizona |
| May 21-22, 2008 | Baltimore, Maryland |
| October 1-2, 2008 | San Antonio, Texas |

| May 20-21, 2009 | Baltimore, Maryland |
| November 4-5, 2009 | New Castle, New Hampshire |
| May 26-27, 2010 | Baltimore, Maryland |

## F.    Price Increases Closely Followed Industry Meetings

117.    Defendants communicated directly with one another regarding the pricing of polyurethane foam, sometimes at PFA industry meetings.   Further, increases in flexible polyurethane foam prices often closely followed industry meetings.   These facts suggest that conspiratorial conversations and agreements regarding prices took place at or outside of these formal meetings.

118.    Specific examples of PFA meetings since 2001 that were closely followed by increases in slabstock foam prices include:

•       A meeting of the PFA occurred from October 17-18, 2001.   Over the next two months, prices increased by 2.3%.

•       A meeting of the PFA occurred from May 8-9, 2002.   Over the next four months, prices increased by 2.0%.

•       A meeting of the PFA occurred from May 7-8, 2003.   Over the next two months, prices increased by 0.8%.

•       A meeting of the PFA occurred from October 8-9, 2003.   Over the next two months, prices increased by 1.7%.

•       A meeting of the PFA occurred from May 3-4, 2006.   Over the next four months, prices increased by 9.3%.

•       A meeting of the PFA occurred from October 3-4, 2007. Over the next four months, prices increased by 3.0%.

• A meeting of the PFA occurred from May 21-22, 2008. Over the next four months, prices increased by 17.3%.

• A meeting of the PFA occurred from May 20-21, 2009. Over the next four months, prices increased by 6.7%.

• A meeting of the PFA is assumed to have occurred in May 2010. Over the next month, prices increased by 6.2%.

## VII.   TOLLING OF THE STATUTE OF LIMITATIONS AND DEFENDANTS' FRAUDULENT CONCEALMENT

119.   The statutes of limitation as to Defendants' and their co-conspirators' continuing antitrust violations were tolled, among other reasons, because of the following allegations which may be additive or read in the alternative.

(a)   Under 15 U.S.C. § 16(i), the statute of limitations is tolled until one year after the date of the conclusion of the United States' last criminal prosecution of Defendants and co-conspirators regarding the polyurethane foam cartel.

(b)   The pendency of a Class Action against Defendants and co-conspirators for conspiring not to compete on the sale of polyurethane foam tolls the running of the statute of limitations as to Plaintiff's claims.

(c)   Defendants' fraudulent concealment as alleged below tolls the statute of limitations.

120.   Plaintiff did not know more than four (4) years before filing this Complaint that Defendants and/or their co-conspirators had entered into the conspiracy alleged in this Complaint.

121.   During time periods relevant to the allegations in this Complaint, Plaintiff used a method of purchasing polyurethane foam that caused it to believe in good faith

at the time that it was receiving competitive prices for polyurethane foam that it directly purchased from one or more Defendants and/or their co-conspirators.  Unfortunately, as alleged below, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged Plaintiff for polyurethane foam during time periods relevant to Plaintiff's antitrust claims despite Plaintiff's due diligence.

122.    Defendants' and their co-conspirators' conspiracy was self-concealing which prevented Plaintiff from discovering its existence more than four (4) years before filing this Complaint.

123.    Notwithstanding the self-concealing nature of their conspiracy, Defendants and their co-conspirators wrongfully and affirmatively concealed the existence of their continuing combination and conspiracy from Plaintiff by, without limitation, one or more of the following acts:

(a)    Providing Plaintiff and others with false or misleading explanations for changes in the price of polyurethane foam so as to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion or falsely stated that their increases were justified by increases in raw material prices;

(b)    Instructing members of the conspiracy not to divulge the existence of the conspiracy to others not in the conspiracy;

(c)    Avoiding either references in documents or the creation of documents otherwise generated in the ordinary course of Defendants' and/or their co-conspirators' businesses regarding conduct which would constitute an antitrust violation or anticompetitive act;

(d)    Conducting covert, secret conspiracy communications or meetings in the United States and elsewhere;

(e)    Submitting prearranged, complementary losing bids, or not bidding, on contracts for the sale of polyurethane foam so as to create the illusion of competition when, in fact, the bids submitted were not competitive;

(f)    Using code names to conceal the identity of co-conspirators in documents that would otherwise reflect an antitrust violation or anticompetitive act;

(g)    Using their attendance at trade association meetings such as, for example, the Polyurethane Foam Association and the International Sleep Products Association as a cover to conceal their conspiracy and to collude; and,

(h)    Using public facsimile machines and other means of communicating conspiracy information to each other in documents that would conceal the identity of the sender and/or the recipient.

124.    Plaintiff did not discover and could not have discovered through the exercise of reasonable diligence, which it exercised, the existence of the claims sued upon before more than four years before the statute of limitations was tolled because of the self-concealing character of the conspiracy and/or because of Defendants' and their co-conspirators' fraudulent concealment of the conspiracy as alleged above.

125.    Plaintiff's claims have been brought within the applicable limitations period.

## VIII.    ANTITRUST VIOLATIONS

126.    Beginning at least as early as approximately January 1, 1999, and continuing until at least July 2010, with an impact that may continue, Defendants and

their co-conspirators engaged in a continuing agreement, understanding and conspiracy not to compete on the sale of polyurethane foam in unreasonable restraint of trade and commerce in *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

127.    The contract, combination and conspiracy among Defendants and their co-conspirators described above consisted of a continuing course, pattern and practice of conduct regarding the production, pricing and sale of polyurethane foam in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

128.    The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were:

    (a)    To fix, stabilize, maintain, and/or raise prices of polyurethane foam in the United States and elsewhere;

    (b)    To allocate the volume of sales and/or market shares of polyurethane foam in the United States and elsewhere;

    (c)    To allocate contracts or accounts to supply polyurethane foam in the United States and elsewhere; and/or

    (d)    To control or reduce the output of and/or capacity to produce polyurethane foam in the United States and/or elsewhere.

129.    In order to formulate and effect the foregoing illegal combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the following overt acts:

(a)    They agreed to exchange and did exchange current and future price information about polyurethane foam sold in the United States and/or elsewhere;

(b)    They agreed to coordinate and did coordinate price levels and price movements of polyurethane foam sold in the United States and/or elsewhere;

(c)    They agreed on prices and price levels of polyurethane foam sold in the United States and/or elsewhere;

(d)    They agreed to allocate and allocated polyurethane foam customers or sales volume, or both, in the United States and/or elsewhere among themselves;

(e)    They agreed to allocate and allocated market shares of polyurethane foam in the United States and/or elsewhere; and/or

(f)    They agreed to control or reduce, and did control or reduce, the output of and/or capacity to produce polyurethane foam in the United States and/or elsewhere.

130.    Defendants and their co-conspirators entered into and refined their illegal combination and conspiracy through, among other things, the overt acts alleged above, including without limitation, participating in conversations and meetings in the United States, Canada and/or elsewhere to discuss the prices of polyurethane foam to be sold, the allocation of polyurethane foam accounts and/or the production of polyurethane foam in the United States and elsewhere, participating in conversations and attending meetings in the United States, Canada and/or elsewhere concerning implementation of and adherence to their conspiracy; issuing price announcements and/or price quotations in the United States and elsewhere in accordance with the conspiracy;

and/or exchanging information on the sale of polyurethane foam in the United States and/or elsewhere.

131.  As a result of Defendants' and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during times relevant to the allegations in this Complaint:

(a)    Price competition in the sale of polyurethane foam among Defendants and their co-conspirators to Plaintiff and others has been restrained, suppressed and eliminated;

(b)    Prices for polyurethane foam sold by Defendants and their co-conspirators have been raised, fixed, maintained and/or stabilized at artificially high and noncompetitive levels throughout the United States and elsewhere; and

(c)    Plaintiff and other direct purchasers of polyurethane foam from Defendants and their co-conspirators have been deprived of the benefit of free and open competition.

132.  Plaintiff has been injured in its business or property by reason of Defendants' and their co-conspirators' antitrust violations alleged in this Complaint in amounts not yet ascertained.  Plaintiff's injuries as direct purchasers of polyurethane foam from Defendants and their co-conspirators are injuries of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' and their co-conspirators' acts unlawful.

133.  Plaintiff is threatened by continuing loss and damage as a result of Defendants' and their co-conspirators' unlawful conduct, and Plaintiff is entitled to injunctive relief.

## IX.    JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues asserted in this Complaint so triable.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

a.    A jury verdict in the amount of the compensatory damages sustained by Plaintiff.

b.    A judgment against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. § 15, and for attorneys' fees, costs and interest as allowable by law.

c.    A permanent injunction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, enjoining Defendants from future violations of the antitrust laws and from practices which facilitate those violations.

d.    Such other the further relief as the Court may deem just and proper.

s/ David C. Eddy
_____
David C. Eddy, Fed ID No. 10051
Dennis J. Lynch, Fed ID No. 7622
Travis C. Wheeler, Fed ID No. 9715
Nexsen Pruet, LLC
1230 Main Street, Suite 700 (29201)
Post Office Drawer 2426
Columbia, South Carolina 29202
PHONE:  803.771.8900
FACSIMILE:  803.253.8277
deddy@nexsenpruet.com
dlynch@nexsenpruet.com
twheeler@nexsenpruet.com

July 31, 2013

*Attorneys for Plaintiff*